Case 13-4065, Tommy Baker, et al. v. Union Township, et al. Oral argument, 15 minutes per side. Mr. Barbieri for the appellants. Good morning, Your Honors. My name is Larry Barbieri. I represent the appellants. I'd like to reserve three minutes for rebuttal. This is a qualified immunity appeal from a tasing which occurred in February of 2011. I know that in the Cockrell case, the decision went straight to the clearly established law issue. I would invite this court to address at least whether or not there was a constitutional violation because on the pendent appellate jurisdiction issue, if there was no constitutional violation, Union Township then is not liable either. With respect to the constitutional issue, I think we have to address it under the context of what the Sixth Circuit has said, constitute excessive force. And the first issue was, what was the severity of the crime? Now in this case, the Union Township officers were dispatched to a VFW hall for a disturbance, which the trial court judge said was really not a very severe crime. Actually, the plaintiff was intoxicated, was involved in a fight at the VFW hall. Then when the officer of entry, the Union Township officer, arrived at the VFW hall, the plaintiff tried to escape, ran away from him, and in fact was convicted of resisting arrest. So we have a resisting arrest crime in addition to the disturbance crime. And I think this court has decided in several cases, Gaddis v. Redford Township and Pursley v. Kitchens, that when plaintiff is resisting arrest, the crime was of moderate severity. So I think Judge Barrett said really it was a minor crime, the disturbance, but I think when you add the resisting arrest, which in fact he was convicted of in this case. With regard to the resisting arrest, I mean with regard to the disturbance, did the call or any other information say that Baker was the person who committed some type of assault or something? No. All the call said was there was a disturbance at the VFW hall, and what happened is But from the officer's point of view, all that he knew was that the person ran when he saw the officer or went back into the VFW hall. Exactly. He started to come out, then he went back in, came out, went out the back door, and then started running away. So Officer Ventry began chasing him. Tommy Baker testified that he knew Officer Ventry was chasing him. He knew he was fleeing from the police. Then Officer Ventry tased him before they got to the house, and apparently it didn't take because Mr. Baker then continued to run home. Now this excessive force case does not involve the first tasing. The plaintiffs have conceded that the first tasing was reasonable, but the plaintiff also pleaded no contest and was convicted of resisting arrest. So I believe on these facts we have a crime which is of moderate severity. Then the next question is, was there any threat to Mr. Baker or to the officer or to anyone else? Now we have a situation here where Mr. Baker was drunk. He was .178. He'd been drinking for some large period of time. He acknowledged that he was too drunk to drive home. He started running home as fast as he could, and we're supposed to look at a qualified immunity analysis from the standpoint of what a reasonable officer would see under the circumstances. Well, Officer Ventry is following Baker. Other than the call for the disturbance, the officer didn't know that he was .178 at that point. He might have suspected he was intoxicated, although he seemed to be able to run fairly well. He was running pretty well, but the officer did not know the extent of the intoxication, no, although I'm sure he suspected Mr. Baker was intoxicated. But Mr. Baker is running away as fast as he can and runs into this house. There was no comment about any type of weapon in the call, and he could see his hands that he was running without a weapon. There was no comment of any weapon, and Officer Ventry did not testify that he believed there was any weapon, no. But Officer Ventry did not know whose house it was that Mr. Baker ran into. He said he really was disoriented at that time. He knew it was 1313-something. He was trying to run the license plate on the car, so he did not know what house Mr. Baker had run into. The car being a car in the driveway? Car in the driveway, right. And Mr. Baker's car was back at the VFW hall, so Officer Ventry had no idea what Mr. Baker intended to do in this house. But if he were really scared, he would have called for backup. He would have waited at the front door and not go barging into a house. But he did have backup. Officer Danielle Smith was there, and she was following him, and she went around to the other side expecting that he might come out the back, and then when she heard the tasing, she came around and inside the front. It wasn't so much a matter of him being scared, but the situation was that there was a person in the house, there may have been a crime committed in the house, and Officer Ventry didn't know what the situation was. He was disoriented. He didn't know where Baker lived, and he didn't know what was going to happen inside the house. He followed Baker into the house, and at that point in time, Officer Ventry was let into the house. Yes, he was let into the house. He banged on the door. He didn't testify that when he was let in the house, the woman said, I don't know who this guy is, but he's just busted into my house. No, she didn't say anything. No indication there was any problem with his being in that house. She didn't say anything at all. And he knocked on the door. She opened the door. He was pounding on the door. She opened the door. He went inside the house, and then he's facing off with Mr. Baker. And Mr. Baker, who had been running away for probably a minute and a half or so, stops, turns around, and is looking at Officer Ventry. And at that point in time, he's standing still, and I know we have to accept the plaintiff's version of the facts for purposes of this motion for summary judgment. At that point in time, Mr. Baker is standing still, but he gives no indication whatsoever that he is surrendering or that he intends to stop resisting arrest or stop running away. And what happens? There was nothing about him or on his person that actually posed a significant threat, was there? Well, he was standing next to a door, and Officer Ventry testified it was his concern that Mr. Baker might go into that room and get a gun or something else, and he wasn't sure what was going to happen next. Well, but you have to take their contention, and I believe that the door was somewhat open and everything was well lit. Well, their contention is it was well lit, and their contention is that the door was open. Okay. But Officer Ventry said he didn't see any stairwell. He did not know it was a stairwell, and he did not... The man is standing there facing him. You can't say something like, well, am I going to have to tase you again, or are we done running, or something like that. You have to immediately... Where's the need for force there? Well, both Jennifer Jones and Officer Ventry said he did say that, but if you take it from what Mr. Baker is saying, he has not stopped running away, and he's got a room, an open door right next to him. I don't know how you turn around and stand and face somebody and run at the same time. Okay, so he's running away, and he stops momentarily and turns around and is facing him. He doesn't say, I surrender. He doesn't get on the ground. In fact, he was intending to go through that door. He testified he was intending to go through that door. Once he goes through that door, then the police officer has a real problem because he is separated by a door from the plaintiff, and the plaintiff could have a gun in there or he could have anything else in there. So the officer doesn't want him to go through that door. Now, if you look at Defendants Exhibit 3, which is where Mr. Baker wrote down where the parties were at the time of the accident or the time of the incident when he stopped and turned around, Mr. Baker is standing like this, and Mr. Baker says he's standing in the middle of the hall. He's standing like this. The door is to his right. He says he's standing right in the middle of the hall about two feet away from the doorway. Officer Ventry is looking directly at him here. So the stairway is up ahead about 8 to 10 feet back. The stairway door is up ahead of him and to the left. There's no way Officer Ventry could have seen that those were stairs. He says he had his flashlight from the taser on the plaintiff. So he's looking dead at the plaintiff, wanting to see what the plaintiff is going to do next, and he's concerned that the plaintiff is going to go through that door, and then he's got a big problem. The plaintiff said it was his intention to go through that door. The plaintiff said he had guns down in the basement which were through that door. Now, Officer Ventry didn't know it was stairs that went downstairs. Are you saying the plaintiff said it was his intention to go down the door if he hadn't been? Yes. He testified to that. He testified that he, I know he was headed down there. He testified it was his intention to go downstairs. Yes, but did he testify that he did not intend to stop? He testified he intended to go downstairs, so that, yes. I thought he testified that he did not move at that point. I mean, whatever intent it was was mental as I understood it. Well, he stopped momentarily. Well, he stopped. He did not move or attempt to go down the stairs. Except he turned before he was tased. That's the point that I'm asking you. Was he describing his intent before he was tased? He testified that before he was tased it was his intent to go downstairs. He stopped for a moment by the stairs, by the room, stopped for a moment, did not say he was going to surrender or anything like that. He said it was his intention to go through that door down the stairs. By his own testimony, he turned toward the stairwell before he was tased. Is that right? I read it as he said that he only twisted his body as he was tasing me, whether you read that as because of the tasing. Are we talking about the same sentence at least? He twisted his body as he was tasing me. I thought he said he twisted his body immediately before he was tased was the way I read it. I think what happened is he said the first time as I was being tased and then he said later it was before he was being tased. It was just before he was tased. So I guess the issue is, and this would go toward the clearly established law issue as well because what this court has said on the clearly established law, what the court said in Cockrell is the question is whether a misdemeanant fleeing from the scene of a nonviolent misdemeanor but offering no other resistance and disobeying no official command has a clearly established right not to be tased. And the court said he did not have a clearly established right not to be tased. Now this person, by all accounts, Mr. Baker, was nonviolent. He was fleeing. He had stopped only for an instant or a couple of seconds. He intended to go through that room. Officer Ventry, now when we look at qualified immunity, when you say he had stopped only for a few seconds, the officer had not followed him into the house. He had been in the house for some period of time, so he doesn't see him run, right? Even taking the best on your side, he's twisted a little bit. It's not like he's running and he stops momentarily. Isn't the real problem that he could have said stop or said something and instead he tases him? Isn't that the crux of the issue is how we read that interaction? I would agree. That's the crux of the issue. But looking at it from Officer Ventry's standpoint, which on a qualified immunity analysis we're supposed to do, giving him the benefit of the doubt, whether every reasonable officer would have known that he shouldn't have been tased, we have a man that had been running for at least 75 seconds, more because it was 75 seconds between the tasings, who stopped momentarily, turned around and looked at him, next to an open door. The door was open, and who knows what was in that room. So we have a situation where Officer Ventry, from his standpoint, thought he had to act immediately to stop him from entering that room, and that's why he was tased. And that's why we don't believe there was a constitutional violation or a violation of clearly established law. Thank you. May it please the Court, my name is Jennifer Branch, and along with Al Gerhardstein, we represent Tommy Baker, who is the plaintiff in this case. I think the discussion you just heard shows that there are many material facts in dispute, which is why this Court doesn't even have jurisdiction to hear this appeal. The defendant is still arguing whether or not Mr. Baker was fleeing before the tasing. That is a material question of fact that must be determined by the jury. This case should not even be here to be decided. But if we were to look at all the facts that the plaintiff has submitted, the law has been clearly established well before 2011 that a person who is not fleeing, not resisting, posing no threat to the police, should not be tased. That is clear in the law. Cockroach gave a great summary of the law, and the case that I would cite to would be Kajowski, where the gentleman was sitting in his truck, and the officer yanked him out of his truck and then tased him. That was in 2010 when this Court ruled that that was excessive force. At best, you would have to say, it seems to me, that Mr. Baker was no longer fleeing. He certainly had been fleeing. And so when the officer followed him into the house, he was following a fleeing person. Yes? I would agree that prior to anybody entering the house, that Mr. Baker had fled after he'd been tased the first time. Well, his testimony was he didn't know the officer was chasing him for a crime or that he wanted him. He never heard the officer call out. He did feel the tasing. He fell down. He got up, and he ran home. At that point, he was fleeing. I would agree. However, he got inside his home. He closed the door, locked the door, and this is the detail that the defendants have not accepted as a material fact from the plainest point of view. Mr. Baker was in the house, and he was muddy and wet because he had fallen in the woods, and he wanted to go downstairs and change his clothes before the cops came because he figured they were going to want to interview him. Before the officer entered the house, he testified he had the intent to change his clothes. His clothes were downstairs in the basement. Once the officer entered the house, he didn't move. He stood still in that hallway in front of the open door to the stairs. That was lit, that everybody who looked at the photograph, which is Exhibit 7 in the depositions, testified. You can see the handrail. You can see the steps. It was clear that that was the stairs. Even Officer Ventry testified in his deposition that when he looked at Exhibit 7 that shows the scene that he could tell that those were stairs. Was that taken from his vantage point? Yes, it was taken from Officer Ventry's point of view while he's standing in the living room looking at Mr. Baker who's standing in front of the stairs, and that's Exhibit 8 in the depositions. And Mr. Ventry looked at both of those photographs and, in fact, testified for Exhibit 8 that Mr. Baker was about a step behind where he's shown in the photograph, which would have shown even more of the railing and more of the step. So the question about whether Officer Ventry could see that he was standing at the top of the stairs is definitely a material fact that's in dispute, and it's a credibility decision, really, because the lights were on, everybody who looked at the photographs could see it, the chief of police, the training officer. Everybody could say, yes, he's on an elevated surface. And when you look at the totality of the circumstances under Graham and you see that he's standing on an elevated surface, even if he were fleeing, it would be excessive force. And that's what Officer Mills testified in his deposition. He's the training officer. He knows, and he's been trained, and Officer Ventry admitted that he knew, yes, part of my job in a rapidly evolving situation is to stop and assess the circumstances. And one of the things I look at is where is the suspect? Is there an elevated surface? If there is, he should not use his taser. He knows that. That is all what's going on inside of Officer Ventry's head, and that is an issue that is a disputed fact. And the material issue of fact with regard to the door, I mean, I guess I should say issues of fact with regard to the door, would include not just lighting and not just the extent to which the door was open, but whether from the officer's vantage point there was any evidence that there was anything by way of vicious canine or weapon behind it. Right. The only testimony about a gun being in the home was after Mr. Baker's laying at the bottom of the steps in a pool of blood crumpled up. The officers went down there to secure the scene, and while they're waiting for the ambulance, they walk around the basement and they find a squirrel rifle and his hunting shotgun, neither of which were loaded, and nobody knew about it ahead of time. Mr. Baker clearly testified in his deposition when he was intending to go downstairs before the officer came in the house, it was a change is close. There was no mention of a gun. There was no mention of a vicious canine in the home. The officer did not testify that he thought he was going to get a gun, and in fact, if you look at the argument that Officer Venturi has made throughout this case, it keeps changing. His discussion of where he shot Mr. Baker, did he shoot him in the chest or did he shoot him in the back? That is a critical fact here, and there has been no concession that he shot him in the chest at the time that he was in the house, because if he shot him in the chest, clearly Mr. Baker was facing Officer Venturi when Officer Venturi tased him, and he wasn't fleeing and running down the stairs with his back to the officer. The officer says originally in his report that he tased Mr. Baker in the back inside the house. Well, where did he get the chest shot then? Everybody admits he was tased in the chest. That was outside before he came in the house. Well, wait a minute. Outside, Mr. Baker is running away from you, and now you're saying that he was tased in his chest outside? And Officer Venturi has come up with three or four different scenarios of how Mr. Baker got tased in the chest when he was running away from him. He tripped. He tripped over a log. He fell. He stopped. He turned. He stopped, he turned, and he took a fighting stance. Every single time he's given testimony or written an incident report, he keeps changing his testimony about the chest shot and the back shot. That is a huge fact here because if he tased in the chest, clearly he was facing the officer. Officer Venturi did not walk into this house and say, stop, you're under arrest, stop, get down on the ground, give zero commands. And Tommy Baker knew that the officer was let in because he could hear the front door open. And he stopped where he was and he put his hands down. He offered absolutely no resistance. He didn't fail to respond to a command because he was given no commands. And he stood still, and the officer came in with his weapon already drawn. Everybody admits that. As soon as he turns the corner of the living room and he sees Tommy Baker, he raises his taser, and as he does so, that's when Jennifer Jones says, don't tase him. And as she says, don't tase him, and the officer begins to tase is when Tommy Baker realizes he's about to get tased and he starts to turn. He obviously started his turn because he's tased in the chest and he's tased in the upper back behind his shoulder, which is why at that point that force was excessive. If you want to go with all of the facts in the plaintiff's favor, then the finding should be, the holding should be that is excessive force, and it's been clearly established since 2010. The alternative for the court would just to say that the defendants are still arguing what the facts are in this case and that Tommy Baker was fleeing, and if that's true, then this is a case where the court has no jurisdiction. Any additional questions? Okay. I think we do not have. Thank you. All right. So I would ask that the court affirm and remand the case for trial so the jury can decide what the facts are. Thank you. Thank you. Thank you. Excuse me. Thank you, Your Honors. The appellants are looking at this case from the viewpoint of plaintiff, and that's the reason that there's an issue here. If we were looking at it from any other viewpoint, from either Jennifer Jones or Officer Ventry, we have a situation where he yelled, stop, don't run, after the plaintiff started going toward the stairs. But the plaintiff says he was standing still, and that's what we're stuck with, even though he was twice the legal limit of alcohol in the system, and we're accepting that for purposes of this motion for summary judgment. But the fact of the matter is the plaintiff never did surrender. Now, there's no question of fact, I don't believe, about whether Officer Ventry knew that there were stairs to the right of the plaintiff. Officer Ventry said he never saw any stairs. He did not know there were stairs there. Officer Danielle Smith came in and said, because of the configuration of the house and the circumstances as they were in the night of the incident, she could not tell there were stairs there until she got right to the top of the stairs. But don't we, in taking it from the point of view of the plaintiff's facts and given the picture which is at best ambiguous or at worst ambiguous, don't we have to say at this point for this decision that the officer could see the stairs? I don't think so. There's no, you're making an inference there. Now, we have a situation where... But you draw inferences in favor of the plaintiff. Isn't that what the story... But this is qualified immunity. Well, but for the facts... Okay, but we have a situation where the plaintiff is standing in front of the basement door. The door is against him, okay? So the door is on this shoulder. He's standing in front of it, and the steps are over here. Officer Benjamin... Isn't that a jury argument, counsel, or a fact argument that it may be, we might think it is less than plausible that the officer can see the stairs, but on qualified immunity appeals, meaning that the judge below apparently thinks that he can see the stairs, that we have to take that. Because that's the only... I mean, your adversary wants to say you're arguing everything, but it seems to me this is the only point that you really are arguing. You're saying we have to take it that the officer couldn't see the stairs. Is that correct? Because the... I don't think there's a dispute... Well, don't give me a because. Is it that your position is that we should take it as he can't see the stairs? Yes. That's my position because the only factual testimony about that is that he could not. That would be true if we didn't have the photograph. But the photograph was taken days later. It doesn't matter. If somebody is saying this photograph was taken from where he was standing... But if we're taking the plaintiff's testimony as true, which we are, you can see from a defendant's Exhibit 3 it was not taken from where Officer Ventry was standing. Officer Ventry, if we're taking the plaintiff's testimony, we take the plaintiff's testimony, and he said that Officer Ventry was standing directly down the hall from him. This photograph was taken at an angle, and that's why you can see into the basement steps. So if we're taking the plaintiff's testimony, which we have to do for purposes of this motion, I agree, he wrote the V and the X for where he was and where Officer Ventry was on defendant's Exhibit 3 in his deposition. It is absolutely clear from that exhibit that the photograph shows a different perspective than what Officer Ventry would have seen. Do you have a photograph from that point? No. There's no photograph from stating exactly where Officer Ventry was because the plaintiff took the photographs and they didn't take it from that point. How did... Was the sketch marked as to where the photograph was taken from? No. No. And how do you know where the photograph was taken from? Well, you can see from looking at the photograph that it's looking at a perspective from an angle. You can see it's not looking straight down the hall. And there was no testimony that that was exactly where Officer Ventry was standing. The testimony was, looking at that, can we see the steps? Well, the fact of the matter is, again, we're taking Tommy Baker's testimony. He drew this exhibit. He drew the people on there and put them in their places. And that photograph is from a different perspective. It's not from Officer Ventry's perspective. And Tommy Baker, at the time of the photograph, according to the testimony, was standing in front of the stairs. Okay, and does it matter whether he could see the stairs? Well, they're saying that if he knew he was on an elevated surface he shouldn't have tased him. Okay, but... But if he can't see the stairs, all he knows is he's going into another room, and that's a dangerous situation. Right, except he wasn't. He was standing still. If you accept what he said, he was standing still. He was standing still for a moment, but Officer Ventry thought, this guy hasn't surrendered. But he didn't have more than a moment. He was standing still for a moment, and Officer Ventry tased him. Right, because Officer Ventry was concerned he was going to go into that room. Well, but he was standing... That's the problem that I have with this. If you look at it from the plaintiff's perspective, he was standing still. Now, the fact that he was only standing still for a second is because he didn't have any further opportunities to do anything. Right, but that's not... When we talk about cockerel in these other cases, you talk about a plaintiff who has been subdued or a plaintiff who has given up, okay, or a plaintiff who says, I surrender. If someone stops and turns around for a second or two, that doesn't mean they're not going to lunge at the police officer a minute later or a second later. That doesn't mean they're not going to lunge into this room. He said he intended to go into that room. If he went into that room, we have a real problem. It only takes him a second to get into that room. Does the officer testify that when he came into the house, Baker was running? Baker ran up to the house and into the house, yes. We know that. But does the officer testify that when he entered the house... The officer testified that when he entered the house, he saw Baker open the door to the basement. Now, that's a question of fact, and we're going with the plaintiff who said he had already opened it. But the officer testified he came into the house. Baker had opened the door to the basement. He said, Stop. Baker didn't stop, and he tased him. And did he say, Stop? The officer said he did. He testified, but we can't take that. Right, and Jennifer Jones said he said, Don't run. And Jennifer Jones said he went toward the... His testimony... He was standing still. And you say he stopped for a second. He was stopped as much as he was stopped. From his point of view, all the time that he and the officer saw each other, he was standing still. Just because he stops for a second, that doesn't mean he's not actively resisting anymore. You're saying when you say the word stopped for a second, it implies that something happened before that second. Whereas here we know he ran into the house, and thereafter, from his point of view, he's standing over at the end of the hallway. The officer does not see him make any motion once the officer comes into the house from the plaintiff's facts. From the plaintiff's facts, that's true. But he has not surrendered. And he has this room next to him that he can bolt into at any moment. Thank you, Your Honors. The case will be submitted. Clerk will call the next case.